# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### CIVIL CASE NO. 1:19-cv-00137-MR

| | |
|---|---|
| JULIUS LAMART HODGES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | **MEMORANDUM OF** |
| vs. ) | **DECISION AND ORDER** |
| ) | |
| ANDY MASSEY, et al., ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

**THIS MATTER** is before the Court on Defendants' Motions for Summary Judgment [Docs. 27, 40].

## I.    BACKGROUND

The incarcerated Plaintiff Julius Lamart Hodges ("Hodges" or simply, "the Plaintiff"), proceeding *pro se*, filed this action pursuant to 42 U.S.C. § 1983 asserting claims arising from his arrest for stealing and crashing a police vehicle, as well as from his subsequent treatment at the Henderson County Jail ("the Jail").  The Plaintiff named as Defendants: Zeff Childress ("Childress"), Michelle Hoyle ("Hoyle"),[1] and Andy Massey ("Massey"), who

_____

[1] "M. Hoylew" in the Complaint.  [Doc. 1 at 2].

are City of Hendersonville police officers; Rob Martin ("Martin"), a Town of Laurel Park police officer; Lowell S. Griffin ("Sheriff Griffin"), who is the Sheriff of Henderson County; and Stephen Greene ("Greene")[2] and Ken McCraw ("McCraw"),[3] who are Henderson County Sheriff's deputies. The Complaint passed initial review[4] on claims of excessive force, involuntary DNA and blood testing, violation of the Plaintiff's right to privacy, deliberate indifference to the Plaintiff's serious medical needs, and failure to provide the Plaintiff with an appropriate religious diet. Defendants Hoyle and Martin have lodged counterclaims against the Plaintiff for battery due to his actions during the arrest, and Defendant Childress in his official capacity has lodged a counterclaim against the Plaintiff for the conversion of his totaled patrol vehicle. [Doc. 19].

The Defendants now move for summary judgment as to all the Plaintiff's claims [Docs. 27, 40]. Defendants Massey, Childress, and Hoyle stipulate to the dismissal their counterclaims if their Motion for Summary Judgment is granted. [Doc. 27 at 2].

---

[2] "Steve Green" in the Complaint. [Doc. 1 at 2].

[3] "Kenny McGraw" in the Complaint. [Doc. 1 at 2].

[4] This case was assigned to Judge Frank D. Whitney at that time. [See Doc. 14].

2

The Court notified the Plaintiff of the opportunity to respond to Defendants' Motions and to present evidence in opposition pursuant to Fed. R. Civ. P. 56. [Docs. 30, 42]. The Plaintiff filed verified Responses to both summary judgment motions [Docs. 36, 43],[5] and the Defendants have filed Replies [Docs. 39, 44]. Having been fully briefed, this matter is ripe for disposition.

## II.  STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

---

[5] In his verified Response to Defendants Griffin, Greene, and McCraw's Motion for Summary Judgment, the Plaintiff also includes some new allegations. For instance, Plaintiff asserts for the first time in his Response that he was provided inadequate dental care for a cracked wisdom tooth [Doc. 43 at 34]; he attempts to revive a claim about legal mail that did not survive initial review [Doc. 43 at 41]; and he attempts to assert a claim of inhumane conditions of confinement that was not set forth as an independent claim in the Complaint and was not recognized as such on initial review [Id.]. These claims are not properly before the Court and will not be separately addressed in this Order. See generally Fed. R. Civ. P. 15(a).

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. Rather, the nonmoving party must oppose a proper summary judgment motion with citation to "depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials" in the record. See id.; Fed. R. Civ. P. 56(c)(1)(a). Courts "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." Eastern Shore Mkt. Inc. v. J.D. Assoc.'s, LLP, 213 F.3d 174, 180 (4th Cir. 2000). The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party."

4

Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

## III. FACTUAL BACKGROUND

The parties' forecasts of evidence show the following, which is undisputed except as otherwise noted.

### A. Plaintiff's Arrest

In the early morning hours of November 1, 2018, Officer Andy Massey responded to a radio call reporting that a man had run into a restaurant saying he was being chased by a co-worker. After arriving on the scene, Massey made contact with the man, who was later identified as the Plaintiff Julius Hodges. [Doc. 27-1: Massey Decl. at ¶ 2]. Massey found Hodges to be very hyper and upset. After determining through a computer check that Hodges had no outstanding warrants, Massey asked what he could do to

help Hodges out. Hodges asked for a ride to the police station so he could use a pay phone and call someone to pick him up. Massey agreed to give him the ride; however, as he drove Hodges into the police parking lot, Hodges exclaimed "this is not the police department," and asked to get out of Massey's police vehicle. Because Massy did not suspect Hodges of criminal activity, he let him leave, and then watched him literally run off into the night. [Id. at ¶ 3].

About fifteen minutes later, Officer Zeff Childress was inside his marked police SUV and stopped at the traffic light at Fourth and Church when he saw a van approaching the intersection. Childress saw the van slam on its brakes, causing a black male adult, who was on top of the van, to roll off and land in the street. Childress quickly got out and approached the man to see if he was okay. The man, who was Hodges, walked past Childress, entered his police vehicle while ignoring commands to stop, and proceeded to drive off at high speed. Using his portable radio, Childress broadcast the theft of his police vehicle and the last seen direction of travel. Childress then remained at the intersection with the driver of the van. Childress was not present to witness Hodges' arrest. [Doc. 27-2: Childress Decl. at ¶ 2].

Both Officer Massey and Officer Michele Hoyle heard Childress's radio broadcast about the theft of his patrol SUV. As they headed towards the last seen direction of travel in their separate police vehicles, Hoyle came across the SUV crashed into a tree. The SUV was unoccupied, and she reported by radio both the crash and the fact that the suspect was not inside. [Doc. 27-3: Hoyle Decl. at ¶ 2]. Hoyle was then joined by Laurel Park Police Department Officer Rob Martin, who was also monitoring the radio traffic about the stolen police vehicle. [Doc. 27-4: Martin Decl. at ¶ 3]. According to Hoyle, it was later determined from the patrol vehicle's GPS monitor that Hodges reached a top speed of 84 miles per hour in a 25-mile per hour zone shortly before the crash happened on a curve. [Doc. 27-3: Hoyle Decl. at ¶ 2].

Meanwhile, Massey was about one block away from Hoyle's location when he saw Hodges walking in the street at the intersection of Fourth Avenue West and Jordan Street. [Doc. 27-1: Massey Decl. at ¶ 4]. Massey immediately stopped his patrol car and approached Hodges while pointing his taser at him and giving him verbal commands to get down on the ground. Hodges appeared to weigh about 180 pounds and had what Massey describes as a "cut" physique, suggesting he was very physically fit and would be difficult to control if he became combative. Hodges complied with

Massey's commands to get on the ground, and Massey was able to handcuff him in the street in front of his patrol car with assistance from Captain Dale Patton.[6]  Per standard procedure, Massey double-locked the handcuffs to prevent them from accidentally tightening on Hodges' wrists.  Around this time, Sergeant Bruce Darrah[7] also arrived on the scene.  [Doc. 27-1: Massey Decl. at ¶ 5].

After assisting Hodges to his feet, Massey walked him out of the street and onto what was probably grass, but that night was very slippery and somewhat muddy.  Instead of placing Hodges immediately into the backseat of his patrol car, Massey decided to keep him outside until EMS arrived to check him over due to the crash.  Hodges cooperated as Massey moved him into a seated position on the ground, but he then quickly started struggling and tried standing up.  [Doc. 27-1: Massey Decl. at ¶ 6].

In order to prevent Hodges from escaping and/or becoming more aggressive, Massey moved him into a face down position on the ground.  Massey was quickly joined by Sergeant Darrah and Officers Hoyle and Martin, and together they tried holding Hodges down while he violently struggled and continually shrieked.  Hodges' arms were very muddy and

_____

[6] The Plaintiff did not name Captain Patton as a defendant in this action.
[7] The Plaintiff did not name Sergeant Darrah as a defendant in this action.

8

slippery, and he tried pulling his hands free from the handcuffs. [Doc. 27-1: Massey Decl. at ¶ 7; Doc. 27-3: Hoyle Decl. at ¶ 4]. Seeing this, Hoyle grabbed her handcuff key, planning to use it to release the double-lock mechanism so she could get the cuffs tightened, but Hodges managed to jerk his right arm free, which sent her handcuff key flying off into the darkness. [Doc. 27-3: Hoyle Decl. at ¶ 4; Doc. 27-1: Massey Decl. at ¶ 8]. Almost immediately, Hodges used his free hand to punch Martin in the arm, after which he reached back and either touched or grabbed Massey's holstered gun. [Doc. 27-1: Massey Decl. at ¶ 8; Doc. 27-4: Martin Decl. at ¶ 4]. Hodges then bent back Hoyle's left wrist, and then yanked her left arm forward with such force that it injured both her elbow and shoulder. [Doc. 27-3: Hoyle Decl. at ¶ 5]. In response to Hodges' physical aggression, Massey used his taser in drive stun mode to deliver a single five second discharge to Hodges' back in an effort to overcome his resistance. The taser application was unsuccessful, and Hodges continued struggling for another minute or so before officers were finally able to re-secure the handcuffs. [Doc. 27-1: Massey Decl. at ¶ 8]. While still struggling, Hodges expelled a burst of diarrhea onto Martin, who was leaning over Hodges' backside while pushing down on his legs in an effort to keep him from getting up or kicking the other officers. [Doc. 27-1: Martin Decl. at ¶ 5].

As the officers worked to get Hodges re-handcuffed, Captain Patton secured shackles around Hodges' legs. Once Hodges was fully restrained, he was lifted to his feet and placed in the right rear seat of Massey's patrol vehicle. EMS arrived shortly and asked Hodges questions in an effort to assess him, but he refused to cooperate.[8] After the EMTs advised the officers that Hodges was clear for transport to jail, Massey drove him straight to the Henderson County Detention Center. At no time during these events did Hodges ever lose consciousness. [Doc. 27-1: Massey Decl. at ¶ 9]. Additionally, at no time during these events did Massey or any other officer on the scene insert a foreign object into Hodges as alleged in the Complaint. [Doc. 27-1: Massey Decl. at ¶ 13].

The Defendants have submitted video files containing the footage from the body cameras worn by Officers Massey and Hoyle at the time of the incidents in question. Massey's body camera footage shows the following events:

---

[8] The Plaintiff concedes that he did not respond to the EMT's questions, arguing that a "jury could conclude the Plaintiff was in fact unconscious and/or unresponsive due to the tasing and kneeing in the back of the Plaintiff's head." [Doc. 36 at 1-2]. The Plaintiff, however, offers no forecast of evidence that he was unconscious at the time that the EMT was attempting to question him. Moreover, as is discussed in more detail infra, the Plaintiff can clearly be heard on the in-car video responding to the EMT's questions and refusing treatment.

10

12:37:47    Massey confronts Hodges and orders him to "get down on the ground" in the street.

12:38:03    Hodges is face down on the ground and Patton appears to have a knee at the back of Hodges' head/neck area. Hodges can be seen raising his head and moving it back and forth.

12:38:42    Patton stands up and Hodges is lifted up from the ground.

12:39:02    Hodges is placed onto the grass adjacent to Massey's police vehicle.

12:39:40    Hoyle tells Hodges he needs to stay seated so he can be checked over by EMS.

12:39:52    Hodges starts struggling to get up and is told to stop resisting.

12:40:30    Martin is seen trying to pin down Hodges' legs to keep him from kicking and getting to his feet.

12:42:13    Hoyle is seen trying to disengage the double lock feature on the handcuffs.

12:42:20    Hodges escalates his struggling and the cycling of Massey's taser is heard.

12:44:01    Patton is able to place shackles on Hodges' ankles.

12:44:41    Hodges is lifted to his feet.

12:44:55    Hodges is placed into the right rear seat of Massey's patrol vehicle and the door is closed.

[Doc. 27-7: Massey Body Cam Video]. Hoyle's body camera footage shows the following events:

12:41:11    Hodges struggles on the ground, and Officer Martin is seen trying to control Hodges' legs.

12:42:16    Hoyle reaches in with her handcuff key to release the double-lock mechanism so the handcuffs could be tightened.

12:41:35    An officer is seen holding the back of Hodges' head to the ground.

12:42:56    Hodges pulls his right hand out of the handcuffs, punches Martin, and grabs Hoyle's left wrist. Officers continue trying to get him re-cuffed. An officer can be heard saying, "Give me your hands."

12:43:10    The discharge of Officer Massey's TASER can be heard here.

12:44:32   Hoyle states, "Got it" after Hodges was successfully re-handcuffed.

12:45:25   Officer Massey's patrol car door closes after Hodges is placed inside.

[Doc. 27-8: Hoyle Body Cam Video]. The Defendants have also submitted the in-car video from Massey's police vehicle, in which the following exchange can be heard between Hodges and an EMT:

12:47:25   An EMT asks Hodges if he is hurt anywhere. Hodges responds that he hurts in his head, his arms, and "everywhere."

12:47:41   The EMT asks Hodges what year it is, and Hodges responds, "forever."

12:47:53   Hodges tells the EMT to "stop looking at me, you pervert."

12:48:00   The EMT asks for Hodges's name, and Hodges give an unintelligible response. When the EMT asks Hodges to spell his name, Hodges responds, "you know my name."

12:48:10   The EMT asks Hodges "do you need us, yes or no." Hodges responds, "hell, no."

[Doc. 27-6: Massey In-Car Video].

Massey transported Hodges to the Jail.  Given the powerful stench from Hodges' defecation, Massey made the trip in about five minutes using both blue lights and an occasional burst of siren.  [Doc. 27-1: Massey Decl. at ¶ 10].  At no time did Massey stop along the way to "beat" and "tase" Hodges as alleged in the Complaint.  [Id. at ¶ 15; see also Doc. 27-6:  Massey In-Car Video].

## B.    Plaintiff's Intake at the Jail

Once at the Jail, Massey and Martin walked Hodges inside and straight into a soft padded holding cell called the "rubber room."[9]  Martin ordered Hodges to kneel down in the corner of the room, and when he refused, Martin pushed him into a kneeling position.  The officers then left Hodges in the custody of detention center staff, and Massey returned to the sally port to clean out his vehicle's backseat.  [Doc. 27-1: Massey Decl. at ¶ 11; Doc. 27-4: Martin Decl. at ¶ 6].

Hodges was processed by Henderson County Sheriff's Office employees Stephen Greene and Kenneth McCraw.  Greene noted that Hodges arrived at the Jail covered in urine and feces.  [Doc. 41-2: Greene

---

[9] The "rubber room' is a holding cell for inmates who cannot be placed in a regular holding cell.  [Doc. 41-2: Greene Dec. at ¶ 5].

14

Decl. at ¶ 4]. Greene's supervisor told Greene to place Hodges in tear-resistant clothing known as a "turtle suit." [Id. at ¶ 6].

Once he was placed in the rubber room, Hodges urinated and defecated in his new jail clothes. [Id. at ¶ 8]. Greene and McCraw removed Hodges' clothes from him and brought him to the shower. [Id. at ¶ 9]. Hodges was escorted to a shower in a secure area where members of the public were not located. [Id.]. While Hodges was taking a shower, his cell was cleaned. [Doc. 41-2: Greene Dec. at ¶ 11]. After he finished, Hodges was given fresh clothes. [Id. at ¶ 12]. During his trip back to his cell, he was not in public view. [Id.].

Hodges alleges that after his shower, Defendant Massey forced him to give blood and DNA samples. [Doc. 1 at 8]. The undisputed forecast of evidence, however, shows that the blood draw was accomplished several hours later, pursuant to a search warrant, by EMS employees rather than Defendant Massey. Nevertheless, Hodges' blood sample tested positive for the presence of bath salts, a synthetic drug which is known to cause superhuman strength and extreme combativeness. [Doc. 27-1: Massey Decl. at ¶ 12; Doc. 27-5: State Lab Report at 4-5].

## C.    Medical Care

The Jail contracts with Wellpath to provide inmate medical care. [Doc. 41-3: McCrain Dec. at ¶ 13].   After being booked, Hodges was seen by Wellpath medical professionals on several occasions for medical and mental health treatment.  [Id.; Doc. 41-8: Medical Records].

The Plaintiff was first assessed by a nurse on the afternoon of November 3, 2018, the day of his arrest.  The nurse's medical note indicates that the Plaintiff "was in mva with airbag deployment per inmate prior to arrest, some small lacerations on hands and wrists stated he was sore all over was offered IBU for pain and inmate refused saying he wanted xrays." [Id. at 12].  The nurse noted that the Plaintiff had no difficulty ambulating. [Id.].

The Plaintiff submitted a grievance on November 7, 2018 stating: "I arrived here last week with some injuries and never received proper medical attention … I can barely walk straight and have a busted blood vessel in my left eye, as well as swollen on right eye...." [Doc. 41-5 at 3].   A medical encounter report shows that the Plaintiff was seen by Nurse Anne Bowen on November 9, 2018 at 9:55 a.m. for a boil on his face.  [Doc. 41-8 at 4].  The notes from the visit indicate that the Plaintiff reported a history of frequent boils and that he presented with a boil on the right side of his face and

irritation to his left eye and possibly to his right due to dry eyes.  [Doc. 41-8 at 5].  The boil was cleansed with wound cleaner and was covered with a band-aid, and the Plaintiff was prescribed antibiotics and eye drops.  [Id.].

The Plaintiff submitted a grievance on November 10, 2018 stating: "My knee is very sore and swollen [I've] informed medical I might need a[n] ace wrap or xray due to swelling still being swollen."  [Doc. 41-5 at 4].  A response by Warren Bradley on November 13, 2018 states: "I will send your request to medical."  [Id.].  The Defendants have not come forward with any forecast of evidence indicating that Plaintiff was rendered medical care in response to that grievance.

### D.    Religious Diet

The Jail also provides religious meals for inmates.  [Doc. 41-3: McCrain Dec. at ¶ 14]. An inmate must request a religious diet from the jail chaplain and, if the inmate has a sincere religious belief, the chaplain will approve the religious diet and notify the jail dietician that the inmate will be receiving a special religious meal.  [Id.].  One of the religious meals offered is a "non-pork diet which is specifically designed to meet the dietary needs of offenders who, for religious reasons, require a non-pork diet and whose dietary requirements cannot be accommodated with foods in the regular menu."  [Id. at ¶ 15].

The Plaintiff submitted a grievance to Food Service on November 4, 2018, stating: "I do not eat pork due to religious reasons, so I would like to be placed on a special diet asap." [Doc. 41-6 at 18]. A response on November 6, 2018 instructed Plaintiff to direct his request to the chaplain. [Id.]. Plaintiff directed a grievance to the chaplain that same day and asked for a kosher diet to accommodate his Hebrew/Jewish religion. [Doc. 41-6 at 14]. Chaplain Keith Honeycutt responded on November 7, 2018 stating: "I will let them know." [Id.]. A Jail Diet Report shows that Plaintiff received a no-pork diet on November 11, 2018. [Doc. 41-9 at 2].

## IV. DISCUSSION

### A. § 1983 Privacy Claim

The Court first turns to the Plaintiff's claim for violation of his right to privacy under 42 U.S.C. § 1983. Specifically, the Plaintiff alleges that Defendants Greene and McCraw deprived him of privacy by stripping him naked in the holding cell of the Henderson County Jail, forcing him to walk down a hallway to a shower, and watching as he showered. [Doc. 1 at 8].

The Prison Litigation Reform Act (PLRA) provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are

exhausted." 42 U.S.C. § 1997e(a). The PLRA's exhaustion requirement is mandatory. See Porter v. Nussle, 534 U.S. 516, 532 (2002); Jones v. Bock, 549 U.S. 199, 211 (2007). "Exhaustion of administrative remedies is mandatory, even where the inmate claims that exhaustion would be futile." Reynolds v. Doe, 431 F. App'x 221 (4th Cir. 2011) (citing Booth v. Churner, 532 U.S. 731, 741 n.6 (2001) ("we will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise")).

Exhaustion must take place before the commencement of the civil action in order to further the efficient administration of justice. Jones, 549 U.S. at 211. The PLRA requires "proper" exhaustion, which means "using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)." Woodford v. Ngo, 548 U.S. 81, 90 (2006) (quoting Pozo v. McCaughtry, 286 F.3d 1022, 1024 (7th Cir. 2002)). The sole exception to PLRA's exhaustion requirement is found in the plain text, i.e., "[a] prisoner need not exhaust remedies if they are not 'available.'" Ross v. Blake, 136 S. Ct. 1850, 1855 (2016). An administrative remedy is not "available" if a prisoner, "through no fault of his own, was prevented from availing himself of it." Moore v. Bennette, 517 F.3d 717, 725 (4th Cir. 2008). Examples of unavailability are: (1) where the procedure operates as a simple

19

dead end because officials are unable or consistently unwilling to provide any relief to aggrieved inmates; (2) where the grievance process itself is so incomprehensible that no ordinary prisoner can discern or navigate it; and (3) where administrators prevent inmates from availing themselves of remedies by way of machination, misrepresentation, or intimidation. Ross, 136 S. Ct. at 1858-60.

Here, the Henderson County Sheriff's Office Detention Manual provides that grievances related to sexual abuse may be submitted at any time; that third parties may assist an inmate in making such a grievance; and that grievances may be submitted to any staff member and need not be submitted to the staff member who is the subject of the complaint. [Doc. 41-4: Manual at 2-4]. The Manual further provides that an inmate who believes that he is at substantial risk of imminent sexual abuse may file an emergency grievance with a supervisor. [Id. at 5].

The Defendants have presented a forecast of evidence that the Plaintiff failed to comply with any of these grievance procedures. The Plaintiff has not presented a forecast of evidence to refute the Defendants' forecast of evidence with respect to these allegations. Instead, he asserts that he believed that an attempt to file a grievance about this matter would have been futile because he was denied an investigation under the Prison Rape

Elimination Act (PREA) and that the Plaintiff "surely doubted to find relief from a[ ] grievance." [Doc. 43 at 2]. However, the Plaintiff's belief that exhaustion would have been futile does not excuse his lack of exhaustion. Booth, 532 U.S. at 741 n.6.

To the extent that the Plaintiff contends that his PREA allegations satisfy the exhaustion requirement, this is refuted by the Detention Manual, which indicates that the filing of a grievance or emergency grievance is required for sexual abuse allegations. See, e.g., McClary v. Butler, No. 5:18-cv-98-FDW, 2019 WL 415336 (W.D.N.C. Feb. 1, 2019) (finding that the plaintiff prisoner's initiation of an action under the PREA does not satisfy the exhaustion requirements contained in the PLRA), aff'd, 773 F. App'x 148 (4th Cir. 2019).

The Plaintiff contends that he was deterred from filing a grievance because he did not want to do so at a kiosk where it would have been available to all staff. [Doc. 43 at 2]. This contention, however, is refuted by the Manual, which provides alternative methods of filing a grievance regarding a sexual allegation. [Doc. 41-4: Manual]. The Plaintiff has failed to demonstrate that the kiosk or any other condition made the grievance procedure unavailable to him.

The Plaintiff also contends that he was unable to exhaust his administrative remedies because he was unaware of the grievance procedure, not having been provided a handbook or provided an orientation regarding the grievance procedure. [Doc. 43 at 9]. This contention, however, is conclusively refuted by the undisputed evidence showing that the Plaintiff had filed numerous grievances beginning on November 7, 2018, just five days after his arrest. [See Doc. 41-5 at 3]. Moreover, the Defendants' forecast of evidence shows that inmates are informed about the grievance policy when they arrive at the Jail.

For the foregoing reasons, Defendants Greene and McCraw will be granted summary judgment on Plaintiff's privacy claim for failure to exhaust administrative remedies.

### B. Excessive Force Claim

The Plaintiff alleges that the police officer Defendants used excessive force during his arrest following his theft and crash of Defendant Childress' patrol vehicle. [Doc. 1 at 7].

The Fourth Amendment prohibits police officers from using force that is "excessive" or not "reasonable" in the course of making an arrest. Graham v. Conner, 490 U.S. 386, 388 (1989); Meyers v. Baltimore Cnty., Md., 713 F.3d 723 (4th Cir. 2013). Whether an officer has used excessive force to

22

Case 1:19-cv-00137-MR   Document 46   Filed 01/06/21   Page 22 of 38

effect an arrest is based on "objective reasonableness," taking into account "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting or attempting to evade arrest by flight." Graham, 490 U.S. at 396, 399. Objective reasonableness is the touchstone; "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." Graham, 490 U.S. at 397.

The Plaintiff's allegations refer to the police officer Defendants generally without attributing various acts to them individually. For example, with respect to his arrest, the Plaintiff alleges that he "surrendered in the presence of Officers Z. Childress, M. Hoyle[ ], R. Martin, as well as A. Massey" and asserts in a conclusory manner that "they all used excessive force after I was already handcuffed." [Doc. 1 at 7]. According to the uncontroverted forecasts of evidence, however, it was Massey who handcuffed Plaintiff and placed him on the grass; the subsequent struggle on the ground involved Defendants Massey, Hoyle, and Martin; Defendant Martin deployed a taser; Defendant Massey transported Plaintiff to the Jail in his vehicle accompanied by Defendant Martin; and Defendants Massey

and Martin walked Plaintiff into the Jail holding cell and had him kneel in the corner before leaving him in the custody of Jail staff. With regard to Childress, he was not present for the Plaintiff's arrest but instead remained on the scene of his initial encounter with the Plaintiff. [Doc. 27-2: Childress Decl. at ¶ 2]. While the Plaintiff generally alleges in his verified Complaint that Defendant Childress was present for the arrest [see Doc. 1 at 7], he does not identify any specific act committed by Childress at that time. Moreover, the Plaintiff has not presented any forecast of evidence that Childress was present at the Jail when Plaintiff was placed in the holding cell where Plaintiff was allegedly kicked, beaten and tased. As the Plaintiff has failed to present a forecast of evidence from which a jury could conclude that Defendant Childress was involved in the arrest and subsequent transport of the Plaintiff, the claims of excessive force against Defendant Childress must be dismissed.

The Court now turns to the actions of the other Defendant officers—Massey, Hoyle, and Martin—who were on the scene of the Defendants' arrest. The Plaintiff alleges that these Defendants: put a knee on the back of his head so that he could not breathe while being handcuffed; pulled down the Plaintiff's pants and inserted foreign objects inside him; tased the Plaintiff

until he lost consciousness; and pulled over on the way to the Jail in order to beat and tase the Plaintiff again.[10] [Doc. 1 at 7-8].

The Plaintiff's allegations regarding his arrest, however, are conclusively refuted by the body cam footage submitted by the Defendants. This footage shows that one of the officers placed a knee at the back of the Plaintiff's neck/head area for a brief period of time but that the Plaintiff was able to speak and move his head freely despite this restraint. The footage also shows that the Plaintiff was moving and communicating with the officers throughout the arrest and thus did not lose consciousness. Further, the footage does not show any officer pulling down the Plaintiff's pants or inserting anything into his body. Finally, the footage conclusively shows that Defendant Massey did not stop his vehicle on the way to the Jail in order to beat and tase the Plaintiff.

The forecast of evidence before the Court—including the testimony of the arresting officers and the body cam footage—demonstrates that the officers were attempting to apprehend a physically strong, combative adult male—who was high on bath salts—on the ground at night, in a damp and

---

[10] In his Complaint, the Plaintiff makes the conclusory assertion that after he was transported to the Jail, the Defendants placed him in a holding cell where he was "stripped naked, kicked, beaten and tased again." [Doc. 1 at 8]. The Plaintiff, however, does not identify which Defendants were allegedly involved in this assault, and he offers no other details about this alleged incident.

slippery environment. The Plaintiff disregarded orders to stay on the ground, and after pulling his arm free from the handcuffs, he physically assaulted two officers and attempted to grab another officer's holstered gun. The body cam footage shows that the officers were able to restrain the Plaintiff thereafter by pinning him to the ground and briefly using a five-second taser application to his back. Given the aggressive conduct of the Plaintiff, the amount of force applied by the officers in restraining the Plaintiff was objectively reasonable. The Court therefore concludes that the Defendants are entitled to summary judgment with respect to the Plaintiff's claims of excessive force.

## C.    Blood and DNA Tests

Plaintiff alleges that Defendant Massey "forced [him] to give [his] blood & DNA" to EMTs. [Doc. 1 at 8].

The Fourth Amendment applies to compelled physical intrusions to withdraw blood, which implicates an individual's "most personal and deep-rooted expectations of privacy." Missouri v. McNeely, 569 U.S. 141, 148 (2013) (quoting Winston v. Lee, 470 U.S. 753, 760 (1985)). Such an intrusion requires either a warrant or exigent circumstances. Id.; see Kentucky v. King, 563 U.S. 452 (2011). However, a buccal DNA swab of arrestees "is a reasonable search that can be considered part of a routine booking procedure." Maryland v. King, 569 U.S. 435, 446 (2013).

The Defendants have submitted a forecast of evidence, by way of video, showing that Plaintiff was offered emergency medical assistance by EMTs at the scene of his motor vehicle accident and arrest; that the Plaintiff refused such assistance; and therefore, no treatment was rendered. [Doc. 27-6: Massey In-Car Video]. No reasonable jury could conclude that blood and DNA testing was performed at that time.

To the extent that a DNA swab was later conducted at the Jail as part of the Plaintiff's booking, any such testing fails to state a Fourth Amendment violation. See King, 569 U.S. at 446. With regard to blood testing for drugs, Defendant Massey has submitted evidence that EMS employees conducted a blood draw from Plaintiff at the Jail several hours after his arrest pursuant to a search warrant. [Doc. 27-1: Massy Decl. at ¶ 12]. The Plaintiff has not come forward with any forecast of evidence attempting to refute the foregoing. The Plaintiff has thus failed to demonstrate the existence of a genuine dispute of material fact for trial with regard to the propriety of the blood draw and DNA testing. Therefore, Defendants' Motion for Summary Judgment will be granted on his Fourth Amendment claims based on allegedly unauthorized DNA and blood testing.

### D. Deliberate Indifference to a Serious Medical Need

The Plaintiff alleges that he was deprived of adequate medical care: when EMTs refused to provide medical attention;[11] upon arriving at the Jail where no nurse was on duty; when Plaintiff complained of a burst blood vessel in his eye, severely swollen knee, and swollen right side of his face; when Plaintiff was given antibiotic ointment and Visene for a "boil" on his face that was actually swollen from a beating and he was not provided any other treatment; when Plaintiff wrote grievances complaining about his swollen knee and difficulty walking and requesting x-rays, for which Plaintiff was never seen; and when Plaintiff requested mental health care due to trauma.

To state a claim for deliberate indifference to a serious medical need, a plaintiff must show that he had serious medical needs and that the defendant acted with deliberate indifference to those needs.[12] Heyer v.

---

[11] The Plaintiff does not specify whether this allegation relates to the denial of medical care at the scene of his arrest or upon his arrival at the Jail. The reasonable inference, however, is that it pertains to the scene of the Plaintiff's arrest when the EMTs first arrived. At the Jail, the responsibility of the Plaintiff's care would have fallen to others.

[12] Because Plaintiff was an arrestee or pre-trial detainee at all times relevant to his complaint, his deliberate indifference claim is properly brought under the Fourteenth Amendment rather than the Eighth Amendment. See City of Revere v. Mass. Gen. Hosp., 463 U.S. 239 (1983); see also Martin v. Gentile, 849 F.2d 863 (4th Cir. 1988) (applying the Fourteenth Amendment to an arrestee's deliberate indifference claim). The Fourth Circuit has long applied the Eighth Amendment deliberate indifference standard to arrestees' and pretrial detainees' claims of the denial of medical care. See, e.g., Young v. City of Mount Ranier, 238 F.3d 567, 575 (4th Cir. 2001); Grayson v. Peed, 195 F.3d 692, 695 (4th Cir.1999); Belcher v. Oliver, 898 F.2d 32, 34 (4th Cir.1990); Martin, 849 F.3d

United States Bureau of Prisons, 849 F.3d 202, 210 (4th Cir. 2017) (citing Iko

v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008)).  A "serious medical need" is

"one that has been diagnosed by a physician as mandating treatment or one

that is so obvious that even a lay person would easily recognize the necessity

for a doctor's attention."  Iko, 535 F.3d at 241 (internal quotation marks

omitted).  "A serious psychological impairment can qualify as [a serious]

medical need."  Buffington v. Baltimore Cnty., Md., 913 F.2d 113, 120 (4th

Cir. 1990).  To constitute deliberate indifference to a serious medical need,

"the treatment [a prisoner receives] must be so grossly incompetent,

inadequate, or excessive to shock the conscience or to be intolerable to

---

at 863.  In Kingsley v. Hendrickson, 576 U.S. 389 (2015), the Supreme Court held that the test for excessive force claims brought by pretrial detainees under the Fourteenth Amendment differs from the test for excessive force claims brought by convicted prisoners under the Eighth Amendment.  Some circuits have held, in light of Kingsley, that an objective reasonableness standard should apply in custodial contexts besides excessive force, including medical claims.  See, e.g., Hardeman v. Curran, 933 F.3d 816 (7th Cir. 2019) (extending the objective standard to conditions of confinement cases); Darnell v. Pineiro, 849 F.3d 17, 35 (2d Cir. 2017) (extending objective standard to conditions of confinement cases); Castro v. City of Los Angeles, 833 F.3d 1060, 1069-70 (9th Cir. 2016 (en banc) (extending the objective standard to failure to protect claims). The Fourth Circuit has not yet addressed this question.  See, e.g., Duff v. Potter, 665 F. App'x 242, 244-45 (4th Cir. 2016) (applying the Kingsley standard to a detainee's excessive force claim but declining to disturb the district court's ruling on plaintiff's claim of deliberate indifference to a serious medical need for procedural reasons).  However, the case law applying the deliberate indifference standard to such claims has not been overruled, and the Fourth Circuit has not expressed any intention to do so.  See, e.g., Shover v. Chestnut, 798 F. App'x 760, 761–62 (4th Cir. 2020)  (applying the deliberate indifference standard to a pretrial detainee's claim regarding a serious medical need without discussing Kingsley).

fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4ᵗʰ Cir. 1990),

*overruled on other grounds by* Farmer v. Brennan, 511 U.S. 825 (1994).

Regarding the Plaintiff's allegation that he was denied proper medical care by the EMTs, the Defendants have submitted a forecast of video evidence showing that EMTs offered Plaintiff medical attention at the scene of his arrest, which the Plaintiff refused. The Plaintiff has not attempted to rebut this forecast of evidence. As no genuine dispute of material fact exists with regards to this allegation, the Defendants will be granted summary judgment on this allegation.[13]

As to the Plaintiff's allegations that he did not receive proper medical treatment upon his admission to the jail, the Plaintiff has failed to demonstrate that the facial swelling, eye redness, and soreness and swelling of his knee of which he complained were serious medical needs within the meaning of the law.[14] Further, he has failed to show that the treatment he received (or failed to receive) was inadequate, much less so grossly inadequate as to be the result of deliberate indifference.

---

[13] The Court notes that the EMTs about which the Plaintiff makes these allegations were not named as defendants in this action.

[14] As for the Plaintiff's assertion as to what the nurse "failed to note," this is conclusively refuted by the evidence of the notes themselves.

To the extent that the forecast of evidence suggests that the Plaintiff's request for x-rays was not honored, this too fails to support a deliberate indifference claim. "[M]ere 'disagreements between an inmate and a physician over the inmate's proper medical care' are not actionable absent exceptional circumstances." Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016) (quoting Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985)). For all these reasons, the Court concludes that the Plaintiff has failed to demonstrate the existence of a genuine dispute of a *material* fact with regard to the medical care he received at intake. Therefore, the Defendants will be granted summary judgment as to this claim.

The Plaintiff further alleges that he requested mental healthcare around November 10, 2018 that was inadequately addressed. With their Motion for Summary Judgment, the Defendants have presented a forecast of evidence consisting of records indicating that the medical department referred the Plaintiff for mental health treatment because the Plaintiff reported anxiety and a possible assault during intake, but that Plaintiff refused mental health services at that time. [Doc. 41-8: Medical Records at 6-7]. On November 9, 2018, the Plaintiff received a mental health visit in response to a request for services. [Id. at 2]. At that time, the Plaintiff was encouraged to seek mental health services as needed, and the record

indicates that a therapist would refer the Plaintiff to a medical provider to evaluate his medications. [Id. at 3]. The records further indicate that the Plaintiff was prescribed medication for anxiety on November 15, 2018, and that he subsequently received additional medications and follow-up. [Id. at 19-21]. The Plaintiff has failed to come forward with any evidence demonstrating that Defendants deliberately provided inadequate or untimely treatment for a serious mental health need. Therefore, summary judgment will be granted with respect to this claim.

Finally, to the extent that the Plaintiff attempts to raise new deliberate indifference claims in his summary judgment response, these claims are not properly before the Court and will be dismissed. See generally Fed. R. Civ. P. 15(a).

### E. Qualified Immunity

"Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). "To determine whether an officer is entitled to qualified immunity, the court must examine (1) whether the plaintiff has demonstrated that the officer violated a constitutional right and (2) whether that right was clearly established at the time of the alleged violation." E.W.

ex rel. T.W. v. Dolgos, 884 F.3d 172, 178 (4th Cir. 2018) (internal quotation marks omitted). The doctrine of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law." Smith v. Ray, 781 F.3d 95, 100 (4th Cir. 2015) (internal quotation marks omitted).

Here, because the Plaintiff has not forecasted evidence that the Defendant violated the Plaintiff's constitutional rights with his respect to his arrest or his medical care, the Defendants are entitled to qualified immunity on these claims. As such, Defendant's Motion for Summary Judgment based on qualified immunity will be granted.

## F. Religious Diet

The Plaintiff alleges that Sheriff Griffin infringed his right to freely exercise his religion when the Jail failed to provide him with a religious diet for 2½ weeks after he requested a special diet to accommodate his Hebrew faith. The Plaintiff further alleges that the no-pork diet that he was provided fails to satisfy his religious requirements because it includes yeast and Plaintiff was "eating out of trays that's had pork in them." [Doc. 1 at 9].

To state a free exercise claim under the First Amendment, a plaintiff must allege facts sufficient to show that he held a sincere religious belief and

that the official action or regulation substantially burdened his exercise of that belief.  See generally Hernandez v. C.I.R., 490 U.S. 680, 699 (1989). An inmate has a "clearly established right … to a diet consistent with his … religious scruples."  Lovelace v. Lee, 472 F.3d 174, 201 (4th Cir. 2006) (quoting Ford v. McGinnis, 352 F.3d 582, 597 (2d Cir. 2003)).  Prison officials violate "this clearly established right if [they] intentionally and without sufficient justification den[y] an inmate his religiously mandated diet." Lovelace, 472 F.3d at 199.  A prison policy that substantially burdens an inmate's ability to practice his religion withstands a First Amendment challenge when it is "reasonably related to legitimate penological interests." O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987) (quoting Turner v. Safley, 482 U.S. 78, 89 (1987)).

Construing the Plaintiff's Complaint liberally, the Plaintiff appears to allege that the inadequate religious diet is due to a Jail policy.  [See Doc. 1 at 9 (alleging that, in response to Plaintiff's request for a kosher diet, Chaplain Honeycutt said that "this facility would never approve or 'Acknowledge' a Kolsher [sic] diet.")].  Moreover, the Plaintiff does not allege that Sheriff Griffin had any personal involvement whatsoever in the alleged denial of an adequate religious diet or any of the other alleged violations of

the Plaintiff's rights. Thus, the Court will analyze this claim with respect to Sheriff Griffin in his official capacity only.

Sheriff Griffin has presented a forecast of evidence showing that it is the policy of the Jail to accommodate inmates of different religious faiths by offering religious meals. One of the religious meals offered is a "non-pork diet which is specifically designed to meet the dietary needs of offenders who, for religious reasons, require a non-pork diet and whose dietary requirements cannot be accommodated with foods in the regular menu." [Doc. 41-3: McCrain Decl. at ¶ 15].

Sheriff Griffin further has presented a forecast of evidence that the Plaintiff submitted a grievance to Food Service on November 4, 2018 for a non-pork diet. After being instructed to direct his request to the chaplain, the Plaintiff submitted a grievance to the chaplain asking for a kosher diet to accommodate his Hebrew/Jewish religion. Thereafter, the Plaintiff began receiving a no-pork diet on November 11, 2018.

Despite the Defendants' showing that Plaintiff was granted a no-pork diet relatively quickly, a genuine dispute of material fact remains regarding whether the Jail's policy merely providing a no-pork diet—as opposed to a kosher diet—substantially burdened Plaintiff's religious exercise. See Beerheide v. Suthers, 286 F.3d 1179, 1187 (10th Cir. 2002) ("[K]osher laws

35

do not deal simply with whether a food item does or does not contain pork or other non-kosher animal products. Kosher laws govern not only the ingredients (both animal and vegetable), but the source, storage, and preparation of those ingredients, and the service of meals."). Viewing the forecast of evidence in the light most favorable to the Plaintiff, a jury could conclude that the Jail's failure to provide a kosher meal substantially burdened the Plaintiff's ability to practice his religion. Therefore, the Defendants' Motion for Summary Judgment on this claim will be denied.

## IV.    CONCLUSION

For the reasons stated herein, this case will proceed to trial[15] against Defendant Griffin in his official capacity on the Plaintiff's claim of an inadequate religious diet. All of the other claims asserted by the Plaintiff are dismissed with prejudice.

This case will be set for trial during the Court's September 13, 2021 mixed term. The parties will be advised at a later time of the precise trial date during that term. To facilitate a resolution of this case before that time,

---

[15] The Plaintiff will proceed to trial *pro se*. [See Misc. Case No. 3:19-mc-00013-MR Doc. 4: Order of Suspension of Prisoner Assistance Program].

36

the parties may request a judicial settlement conference before the Magistrate Judge.  <u>See</u> LCvR 16.3(d)(2).

## <u>ORDER</u>

**IT IS, THEREFORE, ORDERED** that the Motion for Summary Judgment by Defendants Andy Massey, Zeff Childress, Michele Hoyle, and Rob Martin [Doc. 27] is **GRANTED**, and the Plaintiff's claims against these Defendants are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that the Defendants Lowell Griffin, Stephen Greene and Ken McCraw's Motion for Summary Judgment [Doc. 40] is **GRANTED IN PART** and **DENIED IN PART**.  Specifically, the Motion is **DENIED** with respect to the Plaintiff's religious diet claim r against Sheriff Griffin in his official capacity.  In all other respects, the Defendants' Motion is **GRANTED**, and the Plaintiff's claims against these Defendants are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that the parties shall advise the Court within fourteen (14) days of the entry of this Order whether they request a judicial settlement conference before the Magistrate Judge.

The Clerk is directed to set this matter for trial during the Court's September 13, 2021 mixed term and to terminate Andy Massey, Kenny

McGraw, Steve Green, Z. Childress, M. Hoylew, and R. Martin as Defendants.

**IT IS SO ORDERED.**

Signed: January 6, 2021

Martin Reidinger
Chief United States District Judge